**UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
NEW HAVEN DIVISION**

| | | |
|---|---|---|
| In re: | : | Case No.:  15-30766 (AMN) |
| MICHAEL H. CESTARO, | : | Chapter 7 |
| *Debtor* | : | |
| | : | |
| | : | |
| RICHARD GIROUARD, | : | Adv. Pro. No. 15-3026 (AMN) |
| *Plaintiff* | : | |
| v. | : | |
| MICHAEL H. CESTARO, | : | |
| *Defendant* | : | |
| | : | |

## <u>MEMORANDUM OF DECISION AFTER TRIAL</u>

### APPEARANCES

| *Counsel for the Plaintiff* | *Counsel for the Defendant* |
|---|---|
| Timothy F. Butler, Esq. | Miguel A. Almodovar, Esq. |
| Thomas B. Noonan, Esq. | Kenneth M. Rozich, Esq. |
| Tibbetts Keating & Butler, LLC | Jacobs & Rozich, LLC |
| 43 Corbin Drive | P.O. Box 1952 |
| Darien, CT 06820 | New Haven, CT 06509 |

A trial in this adversary proceeding was held on August 7, 2017, and the Court ruled in favor of the defendant on the first three counts[1] brought pursuant to 11 U.S.C. §§ 523(a)(2), 523(a)(4), and 727(a)(2).   After review of the full record of the trial as supplemented by post-trial briefing of the parties, the Court amends a portion of its previously announced findings of fact and conclusions of law, but continues to rule in favor of the defendant on the first three counts of the complaint.  As to the fourth count, in which the plaintiff seeks to deny the debtor a discharge pursuant to 11 U.S.C. §

---

[1]     The plaintiff styled each count as a "claim," but this decision will reference each claim as a "count."

727(a)(3), the Court concludes that judgment shall enter in favor of the defendant.   A separate judgment in favor of the defendant as to all counts will enter.

## JURISDICTION

This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1334(b) and 157(b), and the District Court's Order of Referral of Bankruptcy Matters, dated September 21, 1984.   This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(I) and (J) (determinations as to the dischargeability of debts and objections to discharge).   This adversary proceeding arises under a Chapter 7 bankruptcy case pending in this District, and therefore venue is proper pursuant to 28 U.S.C. § 1409.  This Memorandum of Decision After Trial constitutes the findings of fact and conclusions of law required by Fed.R. Bankr.P. 7052, incorporating Fed.R.Civ.P. 52.

## FACTS

The plaintiff, Richard Girouard ("Girouard"), commenced this adversary proceeding by filing a complaint against Michael Cestaro ("Mike" or "defendant"). Girouard alleged in the first and second counts of the complaint that Mike's debt to Girouard should be determined to be non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(false pretenses, false representation, or actual fraud) or 523(a)(4)(fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny).   In the third and fourth counts of the complaint, Girouard alleged that Mike should be denied a bankruptcy discharge of his debts to all creditors pursuant to 11 U.S.C. §§ 727(a)(2)(transfer, removal, concealment of property before or after the petition) or 727(a)(3)(failure to keep records).

According to the allegations set forth in the complaint and testimony at trial, Girouard claimed to have an oral agreement with Mike and his brother Pasquale Cestaro, Jr. (also known as Pasquale, referenced herein as at trial as "Pat", or together with Mike, the "Cestaro brothers"), individually, to provide financing for the purchase of high-end automobiles.  Mike and Pat owned and operated a car dealership called Cestaro & Sons, Inc. ("C&S"), but Girouard's testimony at trial was clear that his agreement was with the individuals rather than with the corporation.

Question:     "But the agreement was with Mike and Pat, individually?"
Girouard:     "Correct."
Question:     "With [sic] the agreement with Cestaro and Sons?"
Girouard:     "No."
*See* AP-ECF No. 73[2], pp. 17-18.

According to Girouard, his oral agreement with Mike and Pat was that they would use the money he provided to purchase and refurbish high-end luxury vehicles, and then sell them at a profit. *See* AP-ECF No. 1, p. 3.  Upon a sale, Girouard and the Cestaro brothers would split the profit evenly, or "50-50."  *See* AP-ECF No. 73, p. 17.  The principal or initial money used to purchase the car would then be used to purchase another vehicle, and so on.  Girouard also testified that he was able to drive the fixed-up luxury cars while C&S was looking for a buyer.  *See* AP-ECF No. 73, p. 182.

There was no specific plan to repay Girouard, and there was no plan about repayment if the economy soured or the market for high-end luxury cars dried up.  This was made clear in Girouard's answers to the Court's questions as follows:

Court:     What was your expectation on the term -- the time when you would get the money back?

---

[2]     References to the docket of the underlying chapter 7 case, case number 15-30766 (AMN), appear in the following format: "ECF No. ___." References to the docket of this adversary proceeding, Adversary Proceeding Case Number 15-03026 (AMN), appear in the following format: "AP-ECF No. ___ ."

| Girouard: | I felt that I -- that I would keep rebuying particular cars. You know, car 1, 2, 3 sold, that either get -- replenish the funds, or that I would use those funds to purchase cars 4, 5, 6. |
| Court: | But there was no specific end time in your mind? |
| Girouard: | No, as long as we were making money, then I'd be fine with it. As long as there were profits. |
| Court: | And what was the mechanism when you would get the money back? |
| Girouard: | The mechanism -- |
| Court: | How did you think that would work? |
| Girouard: | -- was supposed to be when the, when the cars were sold. I didn't -- I neglected to chase the money at that time. |
| Court: | And there was no agreement as to an interest rate. Is that fair to say? |
| Girouard: | No, strictly on a 50/50 profit split. |

AP-ECF No. 73, pp. 74-75.

Contrary to this testimony, the other evidence at trial, including documents, evidence of wire transfers to C&S, and testimony by both Girouard and Mike, support a finding that Girouard made an agreement with C&S rather than with Mike and Pat, individually.

| Question: | And the business transactions were going to be done through their business. Cars were going to be purchased, and then cars were going to be sold. |
| Girouard: | Correct. |
| Question: | And so, it looks like you did business with their business based on those facts. But you never had them sign anything to be personally responsible for these loans. Correct? |
| Girouard: | Correct. |

See AP-ECF No. 73, p. 70.[3]

According to the wire transfer information introduced by the plaintiff, a trust named the "A Gerry Girouard M. Claire Girouard Real Est Trust" (the "Real Estate Trust") made four wire transfers of substantial funds from the Real Estate Trust's account to a bank account in the name of "Cestaro and Sons Auto Sales." Pl. Exh. 101. The transfers by

---

[3]     See also, Pl. Ex. 110 (Letter from Girouard's brother to Mike stating "[a]s requested in your letter of November 30, 2010, enclosed is a revised amortization schedule on the loan changing the name to your corporation and the signer as Pasquael [sic] Cestaro, President.")

the Real Estate Trust to the C&S account totaled $535,000.00 (the "Funds") and occurred

during 2006 and 2007 as follows:

| Date | Amount | Payment Detail Noted on Wire Transfer |
|------|--------|----------------------------------------|
| December 1, 2006 | $145,000.00 | (blank) |
| December 7, 2006 | $125,000.00 | Ref Richard Girouard |
| December 15, 2006 | $134,000.00 | Rick Girouard |
| March 29, 2007 | $131,000.00 | Rick Girouard |

The Real Estate Trust is not a party to this adversary proceeding, nor was any

evidence other than Girouard's testimony offered regarding the nature of the Real Estate

Trust, or the relationship – if any – between plaintiff Girouard and the Real Estate Trust.

Girouard testified that he established the Real Estate Trust for his parents, "to help them

out financially, and so [he,] would have access to the funds when [he] was later

incarcerated."  AP-ECF No. 73, p. 73.  Girouard's father was "basically the escrow agent"[4]

for the Real Estate Trust and his father wired the money detailed above to C&S because

Girouard didn't want to do it.[5]  But no evidence other than Girouard's testimony was

submitted regarding the role of the elder Girouard as an escrow agent, the terms of the

---

[4]   *See* AP-ECF No. 73, p. 73. It is unclear what relevance an escrow agent has here.

[5]   Question:     So you didn't -- you didn't receive this receipt as proof of your transaction?
      Girouard:     My father received that copy of that receipt. I didn't receive the receipt.
      Question:     Well, but your father is acting on your behalf, right?
      Girouard:     Correct.
      Question:     He's doing the wire because you didn't want to do it, right? That's -- right?
      Girouard:     Right.
      Question:     Okay. So it was available to your agent.
      Girouard:     Right.
      AP-ECF No. 73 p. 44.

Real Estate Trust documents, the beneficiaries of the Real Estate Trust, or Girouard's authority to collect monies originally disbursed by the Real Estate Trust.

While the evidence was clear that the money in issue originated from an account titled in the name of the Real Estate Trust, there was a lack of clarity as to the operation of C&S. Mike testified that he and his accountant were responsible for the bookkeeping for C&S, but the high-end cars that are relevant here were purchased from a high-end account, which was the responsibility of Pat, only. *See* AP-ECF No. 73, pp. 145-146. Pat, however, testified that he did not recall if Girouard loaned C&S money, that he handled the car sales, and that Mike handled all of the banking and finance. *See* AP-ECF No. 73, pp. 99-100.

Regarding the specific vehicles that were part of the alleged agreement, the parties agreed that plaintiff's Exhibit 103, described as an inventory list ("Inventory Sheet") labeled "Rick's Money" with some handwritten notes, should be admitted as a full exhibit. Neither Mike nor Pat adopted authorship of the Inventory Sheet, but it is substantially recreated in the table, below.

| | [Hand-written note] FLOOR PLAN |
|---|---|
| Mike | $180,000.00 |
| Bentley GT | 103,000.00 |
| 06 Porsche Cayenne | 36,000.00 |
| 06 Bentley White (into Rick's) | 30,000.00 |
| 01 BMW 328 | 8,000.00 |
| 04 Acura TL | 16,800.00 |
| 04 Turbo Cayenne | 38,000.00 |

| 05 Maserati | 60,000.00 |
|---|---|
| 01 CLK 430 | 14,000.00 |
| 06 525 XI | 26,900.00 |
|  | 512,000 Total [handwritten and circled] [actual total is $512,700] |

Girouard testified that he retained possession and title to the $103,000 Bentley GT, referenced in the table above, which reduced the principal amount he claimed to be owed to approximately $409,000.00.

Later, between 2010 and 2012, Girouard was incarcerated for felony bank fraud. *See* AP-ECF No. 73, pp. 65-66.  During that time, on November 5, 2010, Girouard's brother and Mike engaged in correspondence that tends to support the conclusion the agreement was between Girouard and C&S.  Girouard's brother, acting on Girouard's behalf, sent a letter addressed to Mike Cestaro at C&S, enclosing an amortization schedule for $450,000 with monthly payments of $5,000 on "the loan [Girouard] has provided to you to support and grow your business . . . Please forward to my attention a check for $15,000 to take care of payments that we discussed over the phone three months ago."  *See* Pl. Exhibit 108.  Mike replied using C&S letterhead on November 30, 2010, and asked that Girouard's brother: (1) "provide proper authority that I can rely on that you are acting on behalf of your brother," (2) adjust the principal amount, and; (3) "modify the signature line to correctly reflect the companies [sic] name not my individual name."  *See* Pl. Exhibit 109.  Girouard's brother replied on December 15, 2010, stating "enclosed is a revised amortization schedule on the loan changing your name to your corporation and the signer as Pasquael [sic] Cestaro, President.  The loan amount has

7

also been changed to $433,000.  As another month has gone by, please forward to my attention a check for $20,000 to take care of payments that we discussed over the phone four months ago."  *See* Pl. Exhibit 110; AP-ECF No. 73, p. 37.

According to Girouard, Mike and Pat agreed to make interest-only payments to Girouard, since around that time "the economy was falling apart" and "[Pat and Mike] were complaining that high-end cars weren't selling anymore."  AP-ECF No. 73, p. 31.  C&S only made one or two interest-only payments to Girouard. AP-ECF No. 73, p. 32.  No evidence of those payments, other than Girouard's testimony, was offered.

C&S ceased operations in approximately 2010.  AP-ECF No. 73, p. 126. According to Pat, C&S had tax issues and other floor plan lenders repossessed cars on its lot.  AP-ECF No. 73, p. 107.  There is no evidence that Girouard had liens against any of the cars that may have been sold or repossessed.  AP-ECF No. 73, p. 159.

Additionally at trial, Mike was unable to explain what happened to the Funds.  AP-ECF No. 73, p. 127.

Question:     As an officer and an owner of C&S, don't you think it was your
              responsibility to know what happened to Mr. Girouard's money?
Mike:         Yes.
Question:     But you're not able to say what happened to Mr. Girouard's money?
Mike:         No.
AP-ECF No. 73, p. 129

Mike was also unable to confirm whether C&S formally wound down its business pursuant to state statute upon the cessation of its business operations.

Question:     Do you know if Cestaro and Sons sent any notice to
              Rick Girouard saying that It was ending its business?
Mike:         I do not recall that one.

Question:    Do you know if Cestaro --- did Cestaro and Sons file a certificate of
             dissolution with the State of Connecticut?[6]
Mike:        I am not a --- I don't know.
AP-ECF No. 73, pp. 130, 133-134.

Girouard filed suit against Mike, Pat, and C&S in the Superior Court of the State of

Connecticut on September 25, 2012.  Mike filed his chapter 7 bankruptcy petition on May

8, 2015, while the state court case was pending.  Mike scheduled "Richard Girouhard

[sic]" as holding a disputed and unliquidated unsecured "Litigation Claim" for $1.00.  No

proof of claim was filed by Girouard, the Real Estate Trust, or any creditor in Mike's "no

asset" chapter 7 case.[7]

The undersigned observes that each of the three witnesses lacked credibility as to

at least some of his testimony, due to the self-serving nature of much of the testimony,

the lack of precision about significant financial transactions as to which much more

detailed record keeping could be expected by all parties, and the shifting nature of the

story throughout the trial.

## APPLICABLE LAW

### I.    Burden of Proof

A plaintiff must prove an objection to discharge by a preponderance of the

evidence.  Fed. R. Bankr. P. 4005; *D.A.N. J.V. v. Cacioli (In re Cacioli)*, 332 B.R. 514,

518 (D. Conn. 2005).  The Advisory Committee Note to Rule 4005 elaborates that,

> [The] rule does not address the burden of going forward with the evidence.
> Subject to the allocation by the rule of the initial burden of producing
> evidence and the ultimate burden of persuasion, the rule leaves to the
> courts the formulation of rules governing the shift of the burden of going
> forward with the evidence in the light of considerations such as the difficulty

---

[6]    No evidence, other than this testimony, regarding a dissolution process by C&S was offered.

[7]    Where a chapter 7 case is a "no asset" case, the Clerk does not set a proof of claim deadline as it
is anticipated that there are no assets to liquidate to pay claims.  For this reason, the lack of a proof of
claim has no bearing on whether Girouard or anyone else has a "claim" against the debtor.

of proving the nonexistence of a fact and of establishing a fact as to which the evidence is likely to be more accessible to the debtor than to the objector. *See, e.g., In re Haggerty*, 165 F.2d 977, 979–80 (2d Cir. 1948); *Federal Provision Co. v. Ershowsky*, 94 F.2d 574, 575, (2d Cir. 1938); *In re Riceputo*, 41 F. Supp. 926, 927–28 (E.D.N.Y. 1941).

Because "§ 727 imposes an extreme penalty for wrongdoing[,]" the Second Circuit Court of Appeals instructs "that [§ 727] must be construed strictly against those who object to the debtor's discharge and 'liberally in favor of the bankrupt.'" *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996).

To sustain an objection to discharge pursuant to § 727(a)(3), the plaintiff must establish by a preponderance of the evidence both:

1.   a failure by the debtor to keep or preserve any recorded information, including books, documents, records and papers, *or* an act of destruction, mutilation, falsification or concealment of any recorded information including books, documents, records and papers by the debtor or someone acting for the debtor; *and*

2.   the failure to keep such books or records or the act complained of renders it impossible to ascertain the financial conditions and material business transactions of the debtor.

6 Collier on Bankruptcy P 727.03 (16th 2018).

"If the creditor shows the absence of records [of the debtor], the burden falls upon the bankrupt to satisfy the court that his failure to produce them was justified." *In re Cacioli*, 463 F.3d 229, 234 (2d Cir. 2006)(citations omitted). "[W]hether a debtor's failure to keep books is justified is 'a question in each instance of reasonableness in the particular circumstances.'" *In re Cacioli*, 463 F.3d at 235 (citations omitted). Pursuant to *In re Cacioli*, the following factors are relevant to the consideration of the reasonableness of a debtor's stated justification: "the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the

amount of credit extended to debtor in his business; and any other circumstances that should be considered in the interest of justice." *In re Cacioli*, 463 F.3d at 237 (*citing Meridian Bank v. Alten*, 958 F.2d 1226, 1231 (3d Cir. 1992)).

The test under § 727(a)(3) is a "loose test, concerned with the practical problems of what can be expected of the type of person and type of business involved." *In re Cacioli*, 463 F.3d at 235. The "inquiry into the debtor's financial condition is limited to the span from a reasonable period of time before the bankruptcy filing through the pendency of the bankruptcy proceedings." *Berger & Associates Attys., P.C. v. Kran (In re Kran)*, 760 F.3d 206, 210 (2d Cir. 2014); *See also Jacobowitz v. Cadle Co. (In re Jacobowitz)*, 309 B.R. 429, 436-37 (S.D.N.Y. 2004) ("When a debtor is engaged in business, he has a duty to maintain records in a manner consistent with what is normally expected of businesses of the same complexity. . . . While this does not necessarily mean that he was required to keep detailed records of his business income and expenses, the debtor was required to produce at least minimal records to allow his creditors to trace the Debtor's financial history for a reasonable period past to present.") (internal citations and quotations omitted).

## II.    Requirement That a Creditor Have Standing to Object to Discharge

Section 727(c) of the Bankruptcy Code provides that, "the trustee, a *creditor*, or the United States trustee may object to the granting of a discharge under subsection (a) of this section." 11 U.S.C. § 727(c)(*emphasis added).* The Bankruptcy Code defines, a "creditor" as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10). A "claim" is broadly defined as a right to payment, whether or not such right is reduced to judgment,

liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.  11 U.S.C. § 101(5).  A "claim" may also include a cause of action or right to payment that has not yet accrued or become cognizable. *See* 2 *Collier on Bankruptcy* P. 101.05 (16th 2018).

The intent behind the definition of "claim" was to deal with "all legal obligations of the debtor, no matter how remote or contingent."  4 *Collier on Bankruptcy* ¶ 502.02 (16th 2018).  "The broad definition of creditor as any entity with a claim, coupled with the broad definition of 'claim' to include a disputed right to payment, means that an entity holding a disputed claim is still a creditor entitled to the rights generally afforded creditors under the [Bankruptcy] Code."  2 *Collier on Bankruptcy* ¶ 101.10 (16th 2018).  The Supreme Court has repeatedly reiterated this principle that a claim is to be afforded the broadest available definition.  *See FCC v. NextWave Personal Communs. Inc.*, 537 U.S. 293, 302 (2003).

"Courts uniformly hold that a plaintiff that is not a creditor lacks standing to object to discharge under § 727(a)."  *Bankers Healthcare Grp., Inc. v. Bilfield (In re Bilfield)*, 493 B.R. 748, 752 (Bankr. N.D. Ohio 2013) *citing, for example, Lussier v. Sullivan (In re Sullivan)*, 455 B.R, 829, 835 (B.A.P. 1st Cir. 2011) ("Thus, whether [plaintiff] has standing here turns on whether [plaintiff] is a creditor."); *Shelton v. Wilson (In re Wilson)*, 311 B.R. 566, 569 (D. Or. 2004), *aff'd* 185 Fed. App'x 696 (9th Cir. 2006) (noting that the plaintiff objected to discharge as a creditor and must be a creditor to have standing to do so); *CM Temp. Servs., Inc. v. Bailey (In re Bailey)*, 375 B.R. 410, 414-15 (Bankr. S.D. Ohio 2007) (same); *Kirby v. Kirby (In re Kirby)*, 356 B.R. 324, 326 (Bankr. D. N.H. 2006) (same); *Rasmussen v. Ryan (In re Ryan)*, 2006 Bankr. LEXIS 4928, 2006 WL 6812694 at *9 (Bankr. D. Idaho 2006) (same).

12

"Without an enforceable obligation [the plaintiff] has no claim, and therefore is not a creditor for purposes" of a dischargeability action. *Premier Capital, LLC v. Gavin (In re Gavin)*, 319 B.R. 27, 32 (BAP 1st Cir. 2004).

## DISCUSSION

Here, Girouard objected to both the dischargeability of the debt he claimed the debtor, Mike, owed to Girouard, and to the Chapter 7 discharge of all of Mike's debts to all of his various creditors.  To have standing to bring these objections Girouard needed to be a holder of a claim against Mike.  While the concept of a "claim" in bankruptcy is quite broad, including as it does claims that are contingent, disputed or unliquidated, a claim must at least be a legally cognizable and enforceable obligation against the debtor. *See Gavin*, 319 B.R. at 32.  For the reasons that follow, the Court concludes that Girouard failed to establish that he holds an enforceable obligation against the debtor Mike. However, even if Girouard had an enforceable obligation against Mike sufficient to meet the standing requirement, he failed to carry his burden of proof at trial on either the objection to discharge or dischargeability.

### I.      Girouard Is Not a Creditor of Mike

To begin, Girouard failed to establish that he was a holder of a claim to repayment of money from Mike.  The uncontroverted evidence offered by Girouard himself was that the substantial sum of money at issue here – approximately $535,000 – was transferred from the Real Estate Trust to C&S.  Other than Girouard's testimony that he was the grantor of the Real Estate Trust, there was no evidence connecting the dots between wire transfers of the Funds from the Real Estate Trust to Girouard's right to pursue repayment, a determination of non-dischargeability or a denial of discharge.  In other words, nothing

13

in the record of this case indicates a wire transfer from the Real Estate Trust resulted in an obligation owed to Girouard personally. Girouard did not act here in a trustee capacity and Girouard failed to present any evidence to establish that Girouard, individually, was the proper party to pursue claims or rights relating to the Funds. *See Kovitz v. Cohen*, 96-5010, 1996 U.S. App. LEXIS 26308 (2d Cir.1996)(summary order) (holding that under New York estate law, any action for the property of a decedent must be by the executor or administrator in his or her representative capacity, appellant was not a creditor and had no standing to bring his action at all to object to the discharge of the debtor).

During trial, Girouard testified he was the grantor of the Real Estate Trust, but there was simply no explanation as to why the Real Estate Trust funds should be repaid to Girouard individually. To the extent the Girouard "asserts claims on his own behalf, the complaint does not sufficiently allege that he—as opposed to [the Real Estate Trust]— suffered a concrete injury." *Fleming v. ISCO Indus.*, 2019 U.S. App. LEXIS 3632, at *2 (2d Cir. 2019)(summary order*) citing Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016) ("[T]he 'irreducible constitutional minimum' of standing" requires a plaintiff to allege that he or she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." (*quoting Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992))).

Had Girouard demonstrated that he was the true party in interest entitled to repayment on account of the Funds transfers, the next hurdle would have been that the Funds were not transferred or paid to Mike. Instead, the evidence showed the Real Estate Trust transferred the Funds to C&S. No evidence was proffered that showed Mike

14

received any portion of the Funds, either initially or at some other time. The uncontroverted evidence at trial demonstrated that there was no writing such as a note or guaranty that bound Mike to repay the Funds to Girouard (or any other party).

During trial, Girouard employed shifting theories by first testifying that his agreement was with Mike individually, and then that Mike's liability to him was grounded in Mike's failure to properly dissolve the C&S corporation. Girouard did not plead (or prove) a claim to pierce the corporate veil of C&S and hold one of its shareholders, Mike, personally liable. *See Hoffmeister v. Early (In re Early)*, 2013 Bankr. LEXIS 4128, at *14 (Bankr. S.D. Miss. 2013) (holding that the plaintiff lacked standing under § 727(c) to bring an action objecting to discharge under § 727(a), since the plaintiff failed to pierce the corporate veil of a corporation to hold the sole shareholder liable.); *See also Hulsing Hotels Tenn. Inc. v. Steffner (In re Steffner)*, 479 B.R. 746, 760 (Bankr. E.D. Tenn. 2012) ("In light of the conclusion that the corporate veil of [corporation] may not be pierced to hold the [defendant] liable for [the corporation's] obligation to [the plaintiff], [the plaintiff] is not a creditor of the [defendant]. Consequently, [the plaintiff] does not have standing to object to the [defendant's] discharge.").

To the extent Mike could be viewed as one and the same as C&S (which was not pled), Girouard, as a "party seeking to pierce the corporate veil" (if that is what he claims to have been) bore the burden of proof. *See Old Farms Associates v. Comm'r of Revenue Servs.*, 279 Conn. 465, 489, 903 A.2d 152 (2006). But, applying Connecticut state common law to a piercing argument, it is clear that Connecticut courts are reluctant to pierce a corporation's veil, and apply the remedy only in "exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used

primarily as an intermediary to perpetuate fraud or promote injustice." *Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc*, 187 Conn. 544, 557, 447 A.2d 406 (1982) (internal quotation marks omitted).  As the Connecticut Supreme Court noted in *Naples v. Keystone Bldg. & Dev. Corp.*,

> [t]he improper use of the corporate form is the key to the inquiry, as "[i]t is true that courts will disregard legal fictions, including that of a separate corporate entity, when they are used for fraudulent or illegal purposes. Unless something of the kind is proven, however, to do so is to act in opposition to the public policy of the state as expressed in legislation concerning the formation and regulation of corporations."

> *Naples v. Keystone Bldg. & Dev. Corp.,* 295 Conn. 214, 233-34, 990 A.2d 326 (2010) (*quoting Tomasso*, 187 Conn. at 559).

Girouard failed to show any misappropriation of corporate funds or transfers of property by C&S to Mike or an entity owned by Mike.  Instead, Girouard relied on the fact that "we have an inventory in [Exhibit 103] in 2008, but four years later, the money 'poof' disappears."  AP-ECF No. 73, p. 107.  It is important to note that Girouard failed to file a lien against the inventory, here the vehicles owned by C&S.  As Girouard failed to demonstrate facts that would allow the Court to pierce the corporate veil, the Court is unable to conclude that Mike is personally liable under that theory.

It was Girouard's task to show Mike had an obligation to keep records that had not been kept, and Girouard simply did not do that.  It is important to note that there was a five-year gap after C&S closed and before the petition date here.  "Section 727(a)(3) requires as a precondition to discharge that debtors produce records which provide creditors with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present."  *O'Hearn v. Gormally (In re Gormally)*, 550 B.R. 27, 54 (Bankr. S.D.N.Y.

2016) *quoting  Bronfman v. O'Hara (In re O'Hara)*, 2013 U.S. Dist. LEXIS 58167, at \*21 (N.D.N.Y Apr. 23, 2013).

While there is no one-size-fits all definition of the "reasonable period before the bankruptcy filing" for every case, a bankruptcy court denied a debtor's discharge under § 727(a)(3) for failing to submit business records for six months preceding the debtor's bankruptcy petition. *In re Jacobowitz*, 309 B.R. 429, 433 (S.D.N.Y. 2004).  By contrast, the Second Circuit Court of Appeals recently affirmed another bankruptcy court's determination that a debtor produced sufficient information to defend a § 727(a)(3) challenge by producing eight years of joint tax returns, bank statements, and credit card statements, in addition to five years of business bank statements.  *In re Steinberg*, 2019 U.S. App. LEXIS 6794, at \*3 (2d Cir. 2019)(summary order).  The facts here are markedly different than in these examples.  For example, the records admitted during the trial included some information for time periods ranging from 2007 through 2010 – more than five years prior to the petition date – and the record suggests that there would be no record-keeping after 2010 when the C&S business ceased.  The trial testimony included the information that that additional corporate records (titles of vehicles) had been produced by the defendant to the plaintiff only to be seized by the Federal Bureau of Investigation at some point, thus clouding the record of what was or was not produced.  AP-ECF No. No. 73, pp. 142-143, 146-147.  Notably, the Chapter 7 Trustee felt there were sufficient records produced to her to enable the full administration of the case and she concluded there were no assets that could be liquidated for the benefit of creditors.  *See,* Chapter 7 Case No. 15-30766, docket entry made August 5, 2015.

Here, Girouard included in his list of trial exhibits a 2010 Tax Return for C&S[8], a letter from Santander Bank enclosing bank statements for January 1, 2008 to November 30, 2008[9], a 2008 C&S balance sheet, and a 2008 C&S adjusting journal entry,[10] so he had received this information.  However, Mike did not produce detailed transactions of every car sold or repossessed from five years after the business ceased operations. Girouard failed to establish who at C&S was responsible for keeping such records[11] and whether it was reasonable for Mike to not produce such documentation five years after the end of C&S' operations.  If this determination were a close call, which it is not, the Court is mindful that its obligation is to construe 11 U.S.C. § 727 strictly against those who object to the debtor's discharge and liberally in favor of the bankrupt.  Under the circumstances present here, assuming the Girouard had standing, Girouard failed to meet his burden of proof.

## II.    Girouard's Rule 15 Motion to Amend Pleadings is Denied

Turning to a statute-based state law remedy, Girouard asserted during final argument at the trial – for the first time – that Mike was liable for C&S's corporate obligations pursuant to officer and director personal liability under Connecticut General Statutes §§ 33-886 and 33-887(b).  *See also Zuvic, Carr & Assocs., Inc. v. Morande Bros.*,

---

[8]        This document was marked for identification only. The remainder of the exhibits discussed in this Memorandum were admitted into evidence.

[9]        The letter's enclosed bank statements were not included in Girouard's exhibits, but the letter's enclosed account opening documents at Sovereign Bank New England were included in Plaintiff's Exhibit 102. These documents stated that the account was opened on May 18, 2007, for the purpose of "Highline/Antiques." It is important to note that the Funds were transferred to the same bank (Sovereign Bank New England), but the dates of the transfers of the Funds were prior to this creation of this bank account. The letter also shows the account was closed on November 30, 2008. *See* Pl. Exhibit 102.

[10]        A 2008 and 2009 General Ledger of C&S was included in Girouard's Proposed Exhibit list, but these documents were not included in his binder of trial exhibits.  The Court lacks evidence of what other discovery items may or may have not been sought from or produced by Mike. However, Mike stated that he produced all records that he has for C&S and all of the bank records that he could find. AP-ECF No. 73, p. 140.

[11]        Mike stated that Pat was responsible for the titles of the "high-line" cars. AP-ECF No. 73, p. 146.

157 Conn. App. 297, 116 A.3d 358 (2015).   Fed. R. Civ. P. 15(b)(1) governs amendment during and after trial based on an objection at trial. Rule 15(b) motions, "are usually made at the conclusion of the plaintiff's case, [and] are intended to correct the theory of an existing claim[,] not to assert new and different claims."   *Pickwick Entm't, Inc. v. Theiringer*, 898 F. Supp. 75, 78 (D. Conn. 1995).   "The purpose of Rule 15(b) is to allow the pleadings to conform to issues actually tried, not to extend the pleadings to introduce issues inferentially suggested by incidental evidence in the record." *Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078, 1086 (2d. Cir. 1977)(*citing Cole v. Layrite Products Co.,* 439 F.2d 958, 961 (9th Cir.1971); *Monod v. Futura, Inc.,* 415 F.2d 1170, 1174 (10th Cir.1969)).   Substantial prejudice may exist where, as here, "it is not clear that the opposing party had the opportunity to defend against the new claim and where that party might have offered additional evidence had it known of the claim." *Grand Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672, 680 (2d Cir. 1985)(*citing Hardin v. Manitowoc-Forsythe Corp.,* 691 F.2d 449, 457 (10th Cir.1982); *International Harvester Credit Corp. v. East Coast Truck,* 547 F.2d 888, 890 (5th Cir.1977)).

Girouard's initial theory of the case was that he had an agreement with Mike and Pat as individuals but as the one-day trial progressed, Girouard shifted, after the conclusion of the evidence, to argue that Mike should be held to officer and director liability based on an alleged failure to properly wind-down C&S.   Because Mike would be substantially prejudiced by a post-trial amendment to the complaint, Girouard's Rule 15(b) motion is denied[12].

---

[12]      Girouard did not make a formal motion under Rule 15(b), but requested several times during the final oral arguments to conform the pleadings to the evidence, which the Court will construe as a Rule 15(b) motion. *See* AP-ECF No. 73, pp. 156, 170, and 195.

Even if the Court granted relief under Rule 15(b), Girouard still failed to meet his burden to establish officer and director liability for two reasons. First, as discussed, Girouard is not a creditor of C&S since the Real Estate Trust and not Girouard individually transferred funds to C&S. Only creditors of a corporation are required to receive notice of the corporation's wind down, and Girouard's theory as pled and as he testified during the trial was that he was a creditor of Mike individually, not C&S. Second, there was no evidence presented that C&S did or did not wind down its business pursuant to state statute.

The Court recognizes the evidence at trial raised a number of questions about the details of C&S's business. But, the only testimony presented regarding the dissolution of C&S was that Mike did not know if a certificate of dissolution was filed with the State of Connecticut. Had the Court granted the post-trial Rule 15(b) motion, it would have been Girouard's burden to prove the elements of a claim of officer and director liability, and he failed to offer evidence to meet that burden.

<u>**CONCLUSION**</u>

The record here simply fails to support the contention that there was an enforceable obligation owed by Mike to Girouard. As it was Girouard's burden to establish his standing by a preponderance of the evidence, and because he failed to meet even this low burden, his claims under § 523 and § 727 must fail for that reason alone.

Assuming *arguendo* that Girouard, and not the Real Estate Trust, was the appropriate plaintiff, the various legal theories by which Girouard could be found to hold an enforceable obligation against Mike (either as an individual or as an officer or director of C&S) are unsupported by the record here. Girouard failed to meet his burden of proof

20

to show that Mike Cestaro individually owed money to him as a result of the Funds transfer.   No evidence was presented supporting a common law veil-piercing claim against C&S that would result in liability by Mike to Girouard, or evidence supporting a claim of officer and director liability pursuant to state corporate law and the alleged wind-down of C&S.  Because of these findings and conclusions, the Court concludes there is no merit to counts one through four of the complaint and will enter judgment in favor of the defendant, Mike.

The decision announced at the end of testimony on August 7, 2017, is amended in that the Court does not assume that the amount transferred from the Real Estate Trust was appropriately designated to be paid back to Girouard, although the parties seem to so assume. *See* AP-ECF No. 73, p. 206.  Mike argued that Girouard was not a creditor his and so lacked standing to bring a claim under 11 U.S.C. § 727.  As explained above, the Court agrees.

Giourard's other arguments asserted during oral argument after trial, and in post-trial submissions, have been considered but are found to be without merit.

For these reasons, a judgment will enter in favor of the defendant, Mike Cestaro, and against the plaintiff, Richard Girouard, on counts one, two, three and four of the complaint.

Dated on March 14, 2019, at New Haven, Connecticut.

Ann M. Nevins
United States Bankruptcy Judge
District of Connecticut